1  ANDREW E. PARIS (SBN 162562)
2  **ALSTON & BIRD LLP**
   333 South Hope Street, Sixteenth Floor
3  Los Angeles, California 90071
   Telephone:  (213) 576-1000
4  Facsimile:  (213) 576-1100
   drew.paris@alston.com

5  JANE F. THORPE (*pro hac vice*)
   SCOTT A. ELDER (*pro hac vice*)
6  **ALSTON & BIRD LLP**
   1201 West Peachtree Street
7  Atlanta, Georgia 30309
   Telephone:  (404) 881-7000
8  Facsimile:  (404) 881-7777
   jane.thorpe@alston.com
9  scott.elder@alston.com

10 Attorneys for Defendant
   **ALACER CORPORATION**

11

12              **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14

15 NICHOLAS J. GIANINO, ARNOLD LEE,    CASE NO.:  SACV09-01247 CJC
   and LORI RISMAN, individually and on   (RNBx)
16 behalf of all others similarly situated,
                                          Honorable Cormac J. Carney
17               Plaintiffs,
                                          **DEFENDANT ALACER'S**
18      v.                                **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN OPPOSITION TO**
   ALACER CORPORATION and DOES 1         **PLAINTIFFS' MOTION FOR CLASS**
19 through 15,                            **CERTIFICATION**

20               Defendants.             Judge:  Hon. Cormac J. Carney
                                          Date:   February 13, 2012
21                                        Time:   1:30 p.m.
                                          Place:  Courtroom 9B
22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................ 4

    A.   Plaintiffs' Challenged Claims ..................................................... 4

    B.   Alacer Has Manufactured More Than Two Dozen Emergen-C Products,   With   Materially   Different   Versions   of   Product Packaging ...................................................................................... 5

        1.   Emergen-C Original Formula ............................................ 5

        2.   Emergen-C Specialty Products .......................................... 7

    C.   Regulatory and Scientific Background ........................................ 8

III.  ARGUMENT ........................................................................................ 11

    A.   Legal Standard for Class Certification ...................................... 11

    B.   Plaintiffs' Proposed Class Is Overbroad ................................... 12

    C.   Plaintiffs' Proposed Class Lacks Commonality ........................ 13

    D.   Plaintiffs Are Not Typical Of Emergen-C Purchasers ............... 17

        1.   Each Plaintiff Is Subject To Unique Facts And Defenses ............ 17

        2.   Plaintiffs Purchased Only a Small Fraction of the Emergen-C  Products They Seek To Include In The Putative Class ............ 21

    E.   Plaintiffs Are Not Adequate Representatives ........................... 24

    F.   Individualized Issues Predominate ............................................ 24

        1.   The Challenged Immunity Claims Were Not Made To The Entire Class, Defeating Certification Of All Claims .................... 25

        2.   Certification of All Claims Is Defeated Because The Materiality Of The Challenged Claims Varies And Is Not Subject To Classwide Proof ........................................................... 26

        3.   Plaintiffs' CLRA and Fraud Claims Cannot Be Certified Because Of Individualized Issues of Reliance and Causation ....... 28

a.      CLRA Claim..................................................................28

b.      Intentional/Negligent Misrepresentation Claims ...............32

G.      Certification Of A Nationwide Class Under California Law Is Improper ........................................................................33

1.      There are Material, Outcome-Determinative Differences Between The Laws Of The Various States...................33

a.      Consumer Protection Statutes .............................34

b.      Intentional/Negligent Misrepresentation Laws ..................36

2.      Other States Have Significant Interests In This Litigation...........38

3.      Other States' Interests Would Be "More Impaired" If California Law Applied ................................................40

IV.    CONCLUSION ........................................................................45

DEFENDANT'S MEMO OF P's AND A'S IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Alleman v. State Farm Life Ins. Co.*,
    508 F. Supp. 2d 452 (W.D. Pa. 2007) ...................................................4

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...............................................................24

*Arabian v. Sony Elec., Inc.*,
    No. 05-CV-1741 WQH (NLS), 2007 WL 627977 (S.D. Cal. Feb. 22, 2007) .......
    ......................................................................17, 20

*BMW v. Gore*,
    517 U.S. 559 (1996).................................................................44

*Bruno v. Quter Research Inst., LLC*,
    No. SACV 11-00173, 2011 WL 5592880 (C.D. Cal. Nov. 14, 2011) .........15, 23

*Campion v. Old Republic Home Prot. Co.*,
    272 F.R.D. 517 (S.D. Cal. 2011) ................................................25, 29

*Chavez v. Blue Sky Natural Bev. Co.*,
    268 F.R.D. 365 (N.D. Cal. 2010) ......................................................33

*Churchill Village, L.L.C. v. Gen. Elec. Co.*,
    169 F. Supp. 2d 1119 (N.D. Cal. 2000)............................................43

*Clark v. Experian Info. Solutions, Inc.*,
    No. 1:03-cv-7882, 2005 WL 1027125 (N.D. Ill. Apr. 26, 2005) .......................44

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)..................................................................11

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (2011) ..............................................................*passim*

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)...........................................................24, 25

*Evans v. Taco Bell Corp.*,
    No. Civ. 04CV103JD, 2005 WL 2333841 (D. N.H. Sept. 23, 2005)................36

DEFENDANT'S MEMO OF P's AND A'S IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Gartin v. S & M Nutec LLC*,
   245 F.R.D. 429 (C.D. Cal. 2007)...................................................24, 25, 31, 32

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)...........................................................................11

*Gonzalez v. Proctor & Gamble Co.*,
   247 F.R.D. 616 (S.D. Cal. 2007) .........................................................19, 29

*In re Bridgestone/Firestone, Inc.*,
   288 F. 3d 1012 (7th Cir. 2002) ..............................................................34

*In re Charles Schwab Corp. Sec. Litig.*,
   264 F.R.D. 531 (N.D. Cal. 2009) ...........................................................44

*In re Checking Account Overdraft Litig.*,
   694 F. Supp. 2d 1302 (S.D. Fla. 2010).....................................................35

*In re Ford Motor Co. Bronco II Prod. Liab. Litig.*,
   177 F.R.D. 360 (E.D. La. 1997) .........................................................39, 40

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
   174 F.R.D. 332 (D. N.J. 1997) ...............................................................38

*In re Grand Theft Auto Video Game*,
   251 F.R.D. 139 (S.D.N.Y. 2008)........................................................34, 39

*In re Hitachi Tele. Optical Block Cases*,
   No. 8cv1746 DMS (NLS), 2011 WL 9403 (S.D. Cal. Jan. 3, 2011) ................34

*In re School Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986) .................................................................45

*In re Toyota Motor Corp.*,
   785 F. Supp. 2d 925 (2011) ..................................................................35

*Johns v. Bayer Corp.*,
   No. 09CV1935 DMS (JMA), 2010 WL 476688 (S.D. Cal. Feb. 9, 2010) ........22

*Johnson v. General Mills*,
   275 F.R.D. 282 (C.D. Cal. 2011)............................................................26

*Keilholtz v. Lennox Hearth Prods. Inc.*,
   268 F.R.D. 330 (N.D. Cal. 2010) ...........................................................33

DEFENDANT'S MEMO OF P's AND A'S IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*LeJeune v. Bliss-Salem, Inc.*,
  85 F.3d 1069 (3d Cir. 1996) ...............................................................38

*Lewallen v. Medtronic USA, Inc.*,
  No. C 01-20395 RMW, 2002 WL 31300899 (N.D. Cal. Aug. 28, 2002).........38

*Martin v. Dahlberg*,
  156 F.R.D. 207 (N.D. Cal. 1994) ......................................................32

*Mazur v. eBay Inc.*,
  257 F.R.D. 563 (N.D. Cal. 2009) ...................................12, 13, 17, 20

*Mlejnecky v. Olympus Imaging Am., Inc.*,
  No. 2:10-CV-02630 JAM-KJN, 2011 WL 1497096
  (E.D. Cal. Apr. 19, 2011) .................................................................22

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)..........................................................................45

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008)........................................................33

*Peviani v. Natural Balance, Inc.*,
  No. 3:10-cv-2451 AJB, 2011 WL 1648952 (S.D. Cal. May 2, 2011) .........18, 24

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)..........................................................................42

*Red v. Kraft Foods, Inc.*,
  No. CV 10-1028-GW, 2011 WL 4599833 (C.D. Cal. Sept. 29, 2011)..............13

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*,
  No. SACV 07-1306 JVS (RNBx),
  2008 WL 4906433 (C.D. Cal. Nov. 13, 2008) ....................................32, 33, 36

*Sanders v. Apple Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009).................................................32

*Siegel v. Shell Oil Co.*,
  256 F.R.D. 580 (N.D. Ill. 2008) ........................................................34

*Smith v. Robbins*,
  528 U.S. 259 (2000).........................................................................44

DEFENDANT'S MEMO OF P's AND A'S IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
　　538 U.S. 408 (2003)..................................................................................44

*Stearns v. Ticketmaster Corp.*,
　　655 F.3d 1013 (9th Cir. 2011) ..................................................12, 25, 27

*Szabo v. Bridgeport Machines, Inc.*,
　　249 F.3d 672 (7th Cir. 2001) ................................................................36

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
　　546 F.3d 196 (2d Cir. 2008) .................................................................11

*Valentino v. Carter-Wallace*,
　　97 F.3d 1227 (9th Cir. 1996) ...............................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
　　113 S. Ct. 2541 (2011)...............................................................3, 11-16

*Webb v. Carter's Inc.*,
　　272 F.R.D. 489 (C.D. Cal. 2011)..........................................................29

*Wiener v. Dannon Co.*,
　　255 F.R.D. 658 (C.D. Cal. 2009)....................................................22, 23

*Wolph v. Acer Am. Corp.*,
　　272 F.R.D. 477 (N.D. Cal. 2011) .................................................29, 33, 39

*Zinser v. Accufix Research Inst., Inc.*,
　　253 F.3d 1180 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001) .........
　　...................................................................................................11, 33

**STATE CASES**

*Avery v. State Farm Mut. Auto. Ins. Co.*,
　　216 Ill. 2d 100 (2005) ..........................................................................35

*Barbara's Sales, Inc. v. Intel Corp.*,
　　227 Ill. 2d 45 (2007) ............................................................................35

*Barrows v. Boles*,
　　687 A. 2d 979 (N.H. 1996)...................................................................36

*Caro v. Procter & Gamble Co.*,
　　18 Cal. App. 4th 644 (1993) ......................................................27, 28, 30

*Clothesrigger v. GTE Corp.*,
191 Cal. App. 3d 605 (1987) ................................................................41, 42

*Cohen v. DirecTV, Inc.*,
178 Cal. App. 4th 966 (2010) .....................................................................25

*Diamond Multimedia Systems, Inc. v. Super. Ct.*,
19 Cal. 4th 1036 (1999) ...............................................................................44

*Discover Bank v. Super. Ct.*,
134 Cal. App. 4th 886 (2005) .....................................................................44

*Fairbanks v. Farmers New World Life Ins. Co.*,
197 Cal. App. 4th 544 (2011) ...............................................4, 25, 26, 27

*In re Tobacco II Cases*,
46 Cal. App. 4th 298 (2009) .................................................................26, 32

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009) .....................................................................28

*Mass. Mutual Life Ins. Co. v. Super. Ct.*,
97 Cal. App. 4th 1282 (2002) .....................................................................29

*McCann v. Foster Wheeler, LLC*,
48 Cal. 4th 68 (2010) ........................................................................*passim*

*Mirkin v. Wasserman*,
5 Cal. 4th 1082 (1993) .................................................................................29

*Pfizer, Inc. v. Super. Ct.*,
182 Cal. App. 4th 622 (2010) ................................................................1, 12

*Vasquez v. Super. Ct.*,
4 Cal. 3d 800 (1971) .....................................................................................29

*Wash. Mut. Bank, FA v. Super. Ct.*,
24 Cal. 4th 906 (2001) .................................................................................38

*Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc.*,
196 Cal. App. 4th 1559 (2011) ...................................................................32

*Wershba v. Apple Computer, Inc.*,
91 Cal. App. 4th 224 (2001) ...............................................................33, 41, 42

*Wilens v. TD Waterhouse Group, Inc.,*
 120 Cal. App. 4th 746 (2003) ..................................................................28

**FEDERAL STATUTES, RULES, REGULATIONS**

21 U.S.C. § 301 *et seq.* ...............................................................................8

21 U.S.C. § 343(r)(6) ....................................................................................8

21 C.F.R. § 101.93(f) .....................................................................................8

65 FR 1000-01 (2000).................................................................................8, 9

Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417,
 108 Stat. 4325 ........................................................................................8

Nutrition Labeling and Education Act of 1990, Pub. L. No. 101-535, 104 Stat.
 2353 ........................................................................................................8

FDA, "Guidance for Industry: Structure/Function Claims, Small Entity
 Compliance Guide" (2002).....................................................................9

Fed. R. Civ. P. 23 ..................................................................................*passim*

**STATE STATUTES, RULES, REGULATIONS**

Cal. Bus. & Prof. Code § 17208 ..............................................................20

Cal. Civ.Code § 1780(a) ...........................................................................28

Cal. Civ. Code § 1783 ...............................................................................20

Cal. Civ. Proc. Code § 338(d).................................................................20

Cal. Corp. Code §§ 25400, 25500 ..........................................................44

815 ILCS 505 *et seq.*................................................................................35

Mass. Gen. Laws Chapter 93A, § 1 *et seq.*............................................36

N.H. Rev. Stat. Ann. § 358-A:1 *et seq.* ..................................................36

**TREATISES, ARTICLES, OTHER AUTHORITIES**

7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
 1760 (3d ed. 2005)...............................................................................12

H. Hemila, et al., "Vitamin C for Preventing and Treating the Common Cold,"
    COCHRANE DATABASE OF SYSTEMATIC REVIEWS (2010)..................10, 11, 16, 17

Office of Dietary Supplements, Dietary Supplement Fact Sheet: Vitamin C .........10

Larry Kramer, Rethinking Choice of Law, 90 Colum. L. Rev. 277 (1990)............41

# I.   **INTRODUCTION**

Alacer is a small dietary supplement company that has manufactured more than two dozen Emergen-C brand products during the more than six year putative class period.  Emergen-C products vary widely in formulation, are designed for different purposes and customers, and are sold in different packaging.  Disregarding the material differences among the products, Plaintiffs seek to certify an "all products, all purchasers" class.  The putative class is vast, encompassing millions of customers nationwide.  Plaintiffs seek recovery of hundreds of millions of dollars in restitution and damages.  Despite the potential enormous sweep of this case, Plaintiffs' motion contains no evidence of the Emergen-C packaging at issue and does not even quote the actual language being challenged.  The reason for this is clear:  Plaintiffs are not really challenging the explicit immunity statements made by Alacer (*e.g.*, "support" or "boost" the immune system) on certain Emergen-C products.  Instead, Plaintiffs' theory is that Alacer's claims *implicitly* communicate a message to all consumers that Emergen-C products prevent and treat the common cold, a claim that has never appeared on any Emergen-C product.  (*See* Pls.' Mov. Br. at 1:14-16 ("Alacer has capitalized on consumers' desire for a cold and flu remedy.").)

Certification of the proposed class pursuant to this implied-claim theory is improper for a number of independent reasons.  First, Plaintiffs' motion fails at the outset because it is vastly overbroad.  *See, e.g., Pfizer, Inc. v. Super. Ct.*, 182 Cal. App. 4th 622 (2010).  Many Emergen-C products contain no representation related to immunity whatsoever.  (*See* Declaration of Ronald L. Fugate, ("Fugate Decl."), ¶ 27 & Exs. 7-15.)  Others, such as the first generation of Emergen-C Original Formula, make only statements that particular vitamins, such as C, are involved in "normal immune function," which Plaintiffs do not challenge in the First Amended Complaint ("FAC").  (*Id.* ¶ 28 & Exs. 16-21.)  Still other products contain "support" or "boost" immunity language, but it is incidental to the primary purpose of the product, such as Bone Health (with vitamin D and calcium) that appears in large letters on the front of

the package.  (*Id.* ¶ 29 & Exs. 22-26.)  Plaintiffs fail to offer evidence that customers purchase Emergen-C Bone Health (or Heart Health, Kids Multi-Vitamin, etc.) expecting these products to prevent the common cold.  There is no basis to certify a class that includes products that do not contain the allegedly misleading representation, or products that are fundamentally different from one another.  Most of these products were not even purchased by the putative class representatives.  Because it is Plaintiffs' burden to provide admissible evidence in support of a properly defined class, the motion can be denied on this basis alone.

Individual issues of materiality, justifiable reliance and causation also predominate.  Contradicting Plaintiffs' theory, half of Emergen-C customers use the products on a year-round basis—not as a seasonal cold remedy.  And Plaintiffs fail to offer any evidence, such as a customer survey, that these issues can be determined by common proof.  They have not shown that all class members construe the challenged language (which does not even appear on all products) as conveying a cold and flu prevention message, and that class members justifiably relied on such a message.  Plaintiffs' own testimony shows that customers purchase Emergen-C products for reasons other than cold prevention, such as energy, and their reliance on this alleged implied message must be individually determined.

The certification motion falters on Rule 23(a) grounds as well.  The Named Plaintiffs are not typical of Emergen-C customers.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (2011).  Nicholas Gianino repeatedly testified that he took Emergen-C because he thought it would "guarantee" that he would not get sick, as if Alacer's product could eliminate the common cold.  (*See* Declaration of Andrew E. Paris ("Paris Decl."), Ex. 3 (Gianino Dep. 191:18-21, 192:20-193:5).)  Not only does this contention go far beyond any allegation in the complaint, it is a patently unreasonable expectation that subjects him to unique attacks atypical of average Emergen-C customers.  Arnold Lee is not a member of the putative class and his claims are barred by the statute of limitations because he purchased Emergen-C prior

1   to the class period.  (*Id.,* Ex. 5 (Lee Dep. 221:13-224:15).)   In addition, the only
2   Original Formula product Lee purchased stated only that vitamin C is "involved in
3   normal immune function," a phrase that Plaintiffs do not challenge and that subjects
4   this package to federal preemption and other defenses, leaving Lee to rely on his
5   purchase of a specialty Joint Health product that renders him atypical of the class.
6   Finally, Lori Risman is not an appropriate representative because her testimony
7   clearly shows that she purchased Emergen-C for its energy benefits, not the immunity
8   benefits that have become the entire basis of Plaintiffs' case.  (*Id.,* Ex. 4 (Risman Dep.
9   38:20-39:11).)  These same problems render the Plaintiffs inadequate representatives.
10  Furthermore, the multiplicity of products and packaging included in the sprawling
11  proposed class precludes any finding of commonality under *Wal-Mart Stores, Inc. v.*
12  *Dukes,* 113 S. Ct. 2541 (2011).

13  Finally, Plaintiffs improperly attempt to apply California law to this putative
14  nationwide class.   It would violate California's governmental interest test and
15  principles of federalism to hold California's minimal interest superior to those of 49
16  other jurisdictions in governing the retail and consumer transactions that occur in their
17  states, merely because Alacer is based in California.  *See McCann v. Foster Wheeler*,
18  *LLC*, 48 Cal. 4th 68 (2010).

19  In sum, Plaintiffs' motion should be denied because the proposed class is vastly
20  overbroad, commonality is lacking, individual issues predominate, and the Named
21  Plaintiffs are atypical and inadequate representatives of the proposed class.

22
23
24
25
26
27
28

## II.     FACTUAL BACKGROUND

### A.     Plaintiffs' Challenged Claims[1]

Plaintiffs seek to certify a nationwide class of purchasers of Emergen-C products based on Alacer's allegedly false claims on product packaging[2] that Emergen-C benefits one's immune system.  (Not. of Mot. at 1:9-24.)  Plaintiffs contend that Alacer "has capitalized on consumers' desire for a product that benefits one's immune system and, therefore, helps them from catching a cold or the flu, or otherwise getting sick." (*Id.* at 1:20-22.)

The weakness of Plaintiffs' motion is evidenced by Plaintiffs' inability to identify an actual claim made by Alacer that is common to each Emergen-C product sold during the class period.  Plaintiff's class certification motion and memorandum do not identify any actual claims made by Alacer in support of their motion.  However, in the FAC, Plaintiffs seek to enjoin Alacer from using the following claims:  "boosts the immune system," "supports the immune system," and "Immune Defense."  (FAC, Prayer for Relief, ¶ E.)  As explained in further detail below, the claims "boosts the immune system" and "supports the immune system" have appeared on the packaging of only certain Emergen-C products sold during different times in the class period.  (Fugate Decl. ¶¶ 12-17, 27-29.)  "Immune Defense" appears in the name of only one of Alacer's products—Immune Defense Formula, a product that has been discontinued by Alacer and accounted for less than four percent of sales during the putative class period.  (*Id.* ¶ 24.)

---

[1]   The sole claims upon which Plaintiffs have sought to certify a class are those pertaining to immunity.  (*See* Not. of Mot. at 1:19-28.)  Although Plaintiffs appeared to challenge additional representations in the FAC, their decision to omit these representations from the class certification motion and memorandum means that these claims are not a basis for certification.  *See Fairbanks v. Farmers New World Life Ins. Co.,* 197 Cal. App. 4th 544, 552 (2011) (holding that plaintiffs waived their UCL unfairness argument where it was not raised in their motion for class certification).  Similarly, Plaintiffs have not moved to certify a class under the unjust enrichment claim (Count IV); *see also Alleman v. State Farm Life Ins. Co.*, 508 F. Supp. 2d 452, 453 n.1 (W.D. Pa. 2007).  Thus, Alacer does not respond to these omitted issues and claims in its opposition brief herein.

[2]   Plaintiffs' motion is entirely based on statements on product packaging.  (*See* Pls.' Mov. Br. at 1:21, 5:6, 5:22.)

**B.      Alacer Has Manufactured More Than Two Dozen Emergen-C Products, With Materially Different Versions of Product Packaging**

Alacer has sold at least two dozen products under the Emergen-C brand during the putative class period, including powdered drink mixes, tablets, liquid shots, and beverages.  (Fugate Decl. ¶ 6.)  As explained below, many of these products have never made any immunity claims on product packaging, others have made only statements regarding "normal immune function," and still others have made immunity claims that are incidental to the primary purpose of the product.  (*Id.* ¶¶ 27-29.) Plaintiffs, therefore, cannot show that the proposed class of all purchasers of Emergen-C products has been exposed to a uniform, material misrepresentation.  In addition, Alacer has never represented on product packaging that Emergen-C products can prevent or cure any diseases, including the common cold.  (*Id.* ¶ 30.)  To the contrary, as required by federal law, Alacer disclaims such usage on the packaging, stating that "[t]his product is not intended to diagnose, treat, cure, or prevent any diseases."  (*Id.*)

**1.      Emergen-C Original Formula**

Alacer's most popular product is the Emergen-C Original Formula,[3] an effervescent powdered drink mix containing 1,000 mg of vitamin C, 7 B vitamins, zinc, and other nutrients, minerals, antioxidants, and electrolytes.  (*Id.* ¶ 8.)  Emergen-C Original Formula is commonly sold in boxes containing 30 or 36 single serving packets.  (*Id.* ¶ 9.)  The Emergen-C Original Formula product packaging has undergone multiple changes, and there have been at least six different versions (referred to herein as "generations") offered for sale during the proposed class period.

---

[3]  During the class period, the Original Formula products have accounted for approximately 80-85% of gross sales, while Specialty products account for the remaining 15-20%. (Fugate Decl. ¶¶ 10, 23.) These products are sold by retailers in many locations, from convenience stores to Costco.  (*Id.* ¶ 37.)  In drug and grocery stores, Emergen-C products are primarily stocked in the vitamin aisle. (*Id.* ¶ 38); (Paris Decl., Ex. 1 (Fugate Dep. at 154:23-155-13).)  Nearly half of the users of Emergen-C products use them year-round.  (Fugate Decl. ¶ 39 & Ex. 28 (average year-round use in 2009 and 2010 48%).)

5

(*Id.* ¶ 11.)  The key differences among the six versions are described as follows:

- **First Generation:**  The first generation of Original Formula product packaging is focused almost entirely on the product's energy benefits.  It does not contain ***any*** representations that Emergen-C can "boost" or "support" the immune system.  The sole immunity-related statement is located on the back panel of the box, which states:  "Vitamin C is essential for the formation and maintenance of connective tissue, is a powerful antioxidant, and is involved in normal immune function."  Prior to the class period and from at least 2002 until the next generation issued in mid-2006, the only immunity-related statements on Original Formula product packaging consisted of this statement.  (*Id.* ¶ 12 & Ex. 1.)

- **Second Generation:**  The second generation is completely different in design and content.  The primary message conveyed on the front panel is that it contains 1,000 mg of Vitamin C and is a "Super Energy Booster."  No immunity message is conveyed on the front or top panel.  On the back panel, it states: (1) "All combined, Emergen-C is a potent blend of antioxidants, vitamins, minerals and other micronutrients that … boost your immunity;" and (2) "Fall/Winter: Emergen-C supports a healthy immune system with 1,000 mg of Vitamin C, Zinc and 32 mineral complexes."  (*Id.* ¶ 13 & Ex. 2.)

- **Third Generation:**  The third generation, identified on the front as a "Health and Energy Booster," revises the immunity claims, which appear only on the back panel.  Benefits are not described according to seasons.  The box provides: (1) "The powerful blend of vitamins, antioxidants and minerals boost your immunity;" and (2) "1,000 mg of vitamin C, zinc, quercetin and antioxidants power up your immune system to promote overall health."  (*Id.* ¶ 14 & Ex. 3.)

- **Fourth Generation:**  The fourth generation removes removes the "Health and Energy Booster" language from the front.  It also removes the "boost" and "power up your immune system" language and replaces them with "support" language: (1) "1,000 mg of vitamin C, antioxidants and minerals support your immune system;" and (2) "1,000 mg of vitamin C, zinc, quercetin, and antioxidants support your immune system."  (*Id.* ¶ 15 & Ex. 4.)

- **Fifth Generation:**  The fifth generation contains only one immunity-related statement instead of two.  The back panel is almost completely filled with the FDA-required supplement facts box.  The single statement regarding immune support appears in small type below the box:  "1,000 mg of vitamin C, zinc, quercetin and antioxidants support your immune system."  (*Id.* ¶ 16 & Ex. 5.)

- **Sixth Generation:**  The current, sixth generation is a complete redesign, replacing the prior version with a cleaner visual style and "bubbles" design. The sixth generation focuses on the flavor and the Emergen-C tag line "Feel the Good."  The back panel contains the large supplement facts box and in small type below:  "1,000 mg of vitamin C, zinc, quercetin and antioxidants support your immune system." (*Id.* ¶ 17 & Ex. 6.)

## 2.  Emergen-C Specialty Products

The Specialty Products are higher-priced and targeted to specific functional health needs (*e.g.*, Joint Health, Heart Health, Bone Health).  (*Id.* ¶ 18.)  Alacer has also expanded the Emergen-C brand to include multi-vitamin products (both adult and children), vitamin C tablets, energy products, enhanced water beverages, and fountain drinks.  (*Id.* ¶ 19.)

The Specialty Products contain different product formulations, make different representations on product packaging, and are targeted to different consumer needs. (*Id.* ¶ 21.)  For example, Joint Health includes glucosamine and chondroitin sulfate, ingredients that help support joint health.  (*Id.* & Ex. 23.)  The product packaging for Joint Health emphasizes the joint strengthening benefits of the product.  (*Id.*)

Although the differences between the Specialty products are too numerous to detail in full, Alacer has prepared representative charts illustrating some of the many products included in Plaintiffs' proposed class.  (*Id.*, Exs. 7, 16, 22.)  These charts show that Plaintiffs' proposed class includes Emergen-C products that have never made any immunity claims on product packaging, such as Splash, Alert!, Electromix, Sleep Health, Vitamin D & Calcium, and MSM (at least one generation).[4]  (*Id.* ¶ 27 & Exs. 7-15.)  In addition, Plaintiffs' proposed class includes Specialty products that contain the statement "Vitamin C is … involved in normal immune function," which even Plaintiffs do not appear to challenge.  These include Super Gram II, Ora-Pops, Heart Health, and the Multi-Vitamin products (at least one generation).  (*Id.* ¶ 28 &

---

[4]  These are by no means all of the products in the putative class definition that completely omit an immunity representation, but are merely examples.

Exs. 16-21.)  Finally, other Specialty products include immunity-related statements on certain packaging generations, but those representations are incidental to the primary representations made, such as Joint Health, Bone Health, and the Multi-Vitamin products (at least one generation).  (*Id.* ¶ 29 & Exs. 22-26.)

Finally, the Specialty products contain important formula differences that make them different from the Original Formula products and each other.  Some of these differences have already been described.  One particular product, Immune+, is mentioned in the FAC but was not purchased by any class representative.  It contains the nutrient compounds beta glucans and arabinogalactan, which are not found in other Emergen-C products, and both of which contribute to the immune system benefits of the product.  (*Id.*, ¶ 25.)

## C.    Regulatory and Scientific Background

Dietary supplements like Emergen-C are regulated by the U.S. Food and Drug Administration (FDA) under the Dietary Supplement Health and Education Act (DSHEA) of 1994.[5]   Under DSHEA, manufacturers are permitted to make "structure/function" claims on the labeling and advertising of dietary supplements.[6]  Dietary supplements cannot claim to diagnose, mitigate, treat, cure, or prevent a disease without being approved under the FDA's more stringent regulations for new drugs.  21 U.S.C. § 343(r)(6).

The FDA has recognized that "DSHEA's purpose [is] to broaden the scope of labeling claims that may be made for dietary supplements without subjecting them to regulation as drugs."  (Paris Decl., Ex. 9.)[7]   Consistent with that purpose,

---

[5]  The Food and Drug Administration regulates the labeling of dietary supplements under the Federal Food, Drug, and Cosmetic Act (FDCA) of 1938, 21 U.S.C. § 301 *et seq.*, as amended by the Nutrition Labeling and Education Act of 1990, Pub. L. No. 101-535, 104 Stat. 2353 and the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325.

[6]  "Structure/function" claims are claims that: (1) "describe the role of a nutrient or dietary ingredient intended to affect the structure or function in humans"; (2) "characterize the documented mechanism by which a nutrient or dietary ingredients act to maintain such structure or function"; or (3) "describe the effect of the dietary supplement on general well-being."  21 C.F.R. § 101.93(f), 21 U.S.C. § 343(r)(6).

[7]  FDA, "Regulations on Statements Made for Dietary Supplements Concerning the Effect of the

substantiation of structure/function claims under DSHEA requires only that manufacturers have "competent and reliable scientific evidence," which has been defined by the FDA and FTC to include "tests, analyses, research, studies, or other evidence…"  (*Id.,* Ex. 10 (Criterion 8).)[8]  Under DSHEA, dietary supplement manufacturers are **not** required to conduct clinical trials or efficacy testing.  (*See id.*, Ex. 11 (FDA Notice).)

Particularly relevant here, the FDA has provided specific guidance that a claim that a product "supports the immune system" is a permissible structure/function claim, not a disease claim.  (*See id.,* Ex. 9 (Final Rule, 2000 WL 4559, at *1028-29); Ex. 10 (Criterion 8).)  Notably, three of the six generations of packaging described in the previous section use only the FDA-endorsed "supports immunity" language, and one uses only the phrase "involved in normal immune function," which is also clearly an acceptable structure/function claim.

Despite Plaintiffs' efforts to mischaracterize Alacer's internal documents, there is ample scientific substantiation for the structure/function claims Alacer has made in connection with its Emergen-C products. Indeed, in an effort to avoid addressing whether they are actually attacking any of Alacer's express claims (as opposed to the implied claim that the product will prevent or treat colds), Plaintiffs have ducked the relevant scientific issues through inexplicable discovery responses refusing to acknowledge even the most basic scientific facts.  Plaintiffs, for example, denied without explanation Alacer's request to "admit that vitamin C is an antioxidant."  (*Id.,* Ex. 8 (Risman Resp. to Second RFA No. 8).)  Similarly, in response to Alacer's interrogatory specifically inquiring whether Plaintiffs "contend that the ingestion of vitamin C at any dose does not support human immune system function," Plaintiffs

---

Product on the Structure or Function of the Body" 65 FR 1000-01, 2000 WL 4559, at *1024 (2000) (the "Final Rule").

[8] *See* FDA, "Guidance for Industry: Structure/Function Claims, Small Entity Compliance Guide" (2002),    available    at:    http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/ GuidanceDocuments/DietarySupplements/ucm103340 (last visited Dec. 23, 2011).

9

ignored the question and instead provided a meaningless answer referring to alleged negative effects of over-consuming vitamin C: "Plaintiff does contend that ingestion of vitamin C at certain doses does not support human immune system function because ingestion of vitamin C in certain doses can cause serious health problems." (*Id.,* Ex. 7 (Gianino Resp. to Second Interrog. No. 16).)   Plaintiffs' response is noteworthy for what it *does not* say, *i.e.*, "yes, it is our position that vitamin C does not support the human immune system."

Plaintiffs' efforts to avoid addressing the claims that actually appear on the Emergen-C packaging is not surprising in light of the available science establishing that vitamin C and the other ingredients in Emergen-C support the immune system. For example, the U.S. National Institutes of Health's Office of Dietary Supplements states in its vitamin C fact sheet:

> Vitamin C…is a water soluble nutrient found in some foods.  In the body, it acts as an antioxidant, helping to protect cells from the damage caused by free radicals….The body also needs vitamin C to make collagen, a protein required to help wounds heal.  In addition, vitamin C improves the absorption of iron from plant-based foods and helps the immune system work properly to protect the body from disease.

(*Id.,* Ex. 12.)[9]

Plaintiffs also misconstrue the scientific evidence about vitamin C and colds and flus (even though that is not the right science to consider because the Emergen-C packaging never promised those benefits).  For example, Plaintiffs cite an Alacer email discussing a scientific paper (the Cochrane review) but fail to present the Court with the full story.  (*See* Pls.' Mov. Br. at 2:2-14.)  Among other things, the Cochrane review concluded that "[b]oth in adults and children, regular vitamin C supplementation resulted in a statistically highly significant reduction in the duration of respiratory episodes that occurred during the prophylactic supplementation period."

---

[9]   Office of Dietary Supplements, Dietary Supplement Fact Sheet: Vitamin C, http://ods.od.nih.gov/factsheets/VitaminC-QuickFacts (last visited Dec. 23, 2011).

(*Id.,* Ex. 14 (H. Hemila, et al., "Vitamin C for Preventing and Treating the Common Cold," COCHRANE DATABASE OF SYSTEMATIC REVIEWS (2010), at 17).)  Thus, while the results on *preventing* colds were inconsistent (taking vitamin C *did* prevent colds, but only in certain sub-populations), the results showed "the consistent effect of vitamin C on the duration of colds." *Id*.  Accordingly, Plaintiffs have not shown any basis for a classwide challenge to Alacer's packaging, which makes only well-supported structure/function claims, at least one of which—supports the immune system—has been addressed and specifically approved by the FDA.

## III.   ARGUMENT

### A.   Legal Standard for Class Certification

In their meagerly-supported motion, Plaintiffs fail to satisfy their burden of demonstrating by a preponderance of the evidence that they have met the four requirements of Rule 23(a) and subsections Rule 23(b)(3).  *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Consistent with their cursory approach, Plaintiffs fail to acknowledge fundamental class certification principles.  As the United States Supreme Court recently affirmed in its *Wal-Mart* decision, "the class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 113 S. Ct. 2541, 2550 (2011).  The Court must subject Plaintiffs' motion to a "rigorous analysis" of the Rule 23 factors to determine whether a plaintiff has satisfied the requirements for class certification.  *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982).  And, contrary to Plaintiffs' suggestion based on language in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), now clearly disapproved of, "it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits." *Ellis*, 657 F.3d at 981; *see also Wal-Mart*, 131 S. Ct. at

11

2552 n.6 (identifying "mistakenly" cited language in *Eisen* as "the purest dictum" and "contradicted by our other cases").

### B.    Plaintiffs' Proposed Class Is Overbroad

Plaintiffs' motion must be denied because it proposes a grossly overbroad class that includes purchasers who were never exposed to the allegedly misleading claims. Plaintiffs thus fail the "implied prerequisite" of an adequate class definition.  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).  The party seeking class certification must demonstrate that an identifiable, definite, and ascertainable class exists.  As Wright and Miller explain:

> the class must not be defined so broadly that it encompasses individuals who have little connection with the claim being litigated; rather, it must be restricted to individuals who are raising the same claims or defenses as the representative.

7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1760 (3d ed. 2005).

The law is well-settled that certification of a proposed class that includes many class members who were not exposed to the alleged misrepresentations is improper. *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1024 (9th Cir. 2011) (finding plaintiffs' proposed class "so broad that it cannot be said that the websites were 'materially deficient' as to the entire class.  Therefore, the district court did not err when it determined that the class could not be certified."); *Pfizer, Inc. v. Super. Ct.*, 182 Cal. App. 4th 622 (2010) (reversing trial court's certification of a California class where many class members were not exposed to the challenged claims).

In *Pfizer*, plaintiffs sought certification of UCL and FAL claims challenging defendant's claim that its Listerine mouthwash product was "as effective as floss." The record indicated that 19 of 34 different Listerine bottles did not contain the challenged claim.  *Id.* at 632.  Thus, the Court of Appeal reversed certification of a "grossly overbroad" class of all Listerine purchasers, explaining that "perhaps the majority of class members who purchased Listerine during the [class period] did so

1   not because of any exposure to Pfizer's allegedly deceptive conduct, but rather,

2   because they were brand-loyal customers, or for other reasons." *Id.* at 632.  *See also*

3   *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW (AGRx), 2011 WL 4599833, at *5

4   (C.D. Cal. Sept. 29, 2011) (denying certification of a nationwide class where allegedly

5   false and misleading claims did not appear on all product packaging or packaging

6   versions plaintiffs sought to include in class definition).

7       Plaintiffs' proposed class consists of "all individuals in the United States who

8   purchased the product Emergen-C from October 28, 2005 to the present."  (Not. of

9   Mot. at 1:10-11.)  This proposed class is overbroad, because:  (1) it includes many

10  products sold under the Emergen-C brand name that have never made any of the

11  challenged claims on their packaging, and (2) even if one generation of a product

12  contains some form of a claim, because of the many changes during the period, other

13  versions do not.  *See* Section II.B.2, *supra*.  The overbreadth warrants denial of

14  Plaintiffs' motion for class certification.  *See Mazur*, 257 F.R.D. at 567 (denying

15  certification where proposed class included non-harmed auction winners as

16  "imprecise" and "overbroad").[10]

17      **C.   Plaintiffs' Proposed Class Lacks Commonality**

18      In light of their wildly overbroad proposed class, Plaintiffs cannot meet their

19  Rule 23(a) burden to establish commonality by a preponderance of the evidence.

20  Indeed, plaintiffs' motion fails on its face because, instead of presenting the required

21  "significant proof" of commonality, *Wal-Mart*, 131 S. Ct. at 2554, Plaintiffs limit their

22  discussion of that critical Rule 23 factor to a mere list of supposedly "common

23  questions."  (Pls.' Mov. Br. at 10:19-11:5.)  But the U.S. Supreme Court made crystal

24  clear that "the raising of common 'questions'" is not "[w]hat matters to class

25  

---

26  [10]  Plaintiffs should not be permitted to attempt to redefine the class in their reply brief, when Alacer

27  will not have a fair opportunity to respond to the argument.  With full knowledge of the patent
    defects in this class definition, Plaintiffs have chosen both to seek the broadest possible class and to
    omit from their motion *any* evidence of the actual Emergen-C packaging upon which their entire

28  class is based.  Plaintiffs should not be rewarded for these choices.  The motion should be denied
    outright.

certification." *Wal-Mart*, 131 S. Ct. at 2551. The class certification motion here should be denied because Plaintiffs do not even address—much less demonstrate with evidence—that their proposed "classwide proceeding" will "generate common answers apt to drive the resolution of the litigation." *Id.*

In fact, as the Supreme Court observed, the many "[d]issimilarities within the proposed class" serve to "impede the generation of common answers" in this litigation in several obvious respects. *Id.* First, contrary to Plaintiffs' unsupported attempt to simplify their allegedly "common questions," there is no one "Emergen-C" product and no single "false, misleading and/or deceptive statement or representation." (Pls.' Mov. Br. at 10:19-11:5.) Instead, as discussed above, in Section II.B.1, Alacer sold at least six generations of both core Emergen-C products and several very different Specialty products. Over the generations, those various products contained varying language in varying package locations, including "normal immune function" versus "boosts" and "supports" versus "power up" versus "supports" versus "immune defense." Yet, despite those undisputed "dissimilarities," Plaintiffs have not even attempted to show that the "determination" of the "truth or falsity" of a claim as to one set of language/packaging/ingredients "will resolve" the "validity of each one of the claims in one stroke" as required under *Wal-Mart*, 131 S. Ct. at 2551. Thus, under plain Ninth Circuit law, because "there is no evidence that the entire class was subject to the same allegedly [wrongful] practice, there is no question common to the class." *Ellis*, 657 F.3d at 983.

Second, Plaintiffs' attempt to prosecute an implied "colds and flu" claim from the various Emergen-C packaging merely compounds the "dissimilarities" that preclude commonality. Whether the proposed class members inferred Plaintiffs' hypothesized "will prevent you from even getting a cold" message from the various Emergen-C packaging is not susceptible to common proof because of the variety of Emergen-C products at issue and the different formulations targeted to different consumers. *Supra*, Section II.B. For example, evidence that a particular generation of

Alacer's "Immune Defense" product communicates a given message would not constitute evidence that the same or different generation of the "Joint Health" or "Bone Health" or even Alacer's core product packaging communicates the same message. Even among Alacer's core products, evidence related to a package that states only that "Vitamin C … is involved in normal immune function" will not necessarily answer questions about the messages conveyed by later generations using different claims, such as "boost immunity." *See Bruno v. Quter Research Inst., LLC*, No. SACV 11-00173, 2011 WL 5592880, at *7 (C.D. Cal. Nov. 14, 2011).

Third, the panoply of dissimilar products and packaging in this sprawling proposed class completely undermines the few tidbits of allegedly common evidence that Plaintiffs do offer. For example, Plaintiffs' reference to an Alacer consumer marketing survey does not provide common answers across the class. Even if the survey did show that consumers select "immune protection" as the number one reason they purchase "Emergen-C" (Pls.' Mov. Br. at 1:24-27), the survey does not provide any information on why consumers purchase the various different individual Emergen-C products, or even what consumers meant by "immune protection," *i.e.*, is that a different statement than "supports your immune system," which the FDA has approved. It also would not show that consumers take away Plaintiff Gianino's alleged implied message that he would never again get sick. Nor does the survey account for consumers who, for example, purchased only the Multi-Vitamin Formula or, like Plaintiff Risman, purchased the product for its energy benefits. (*See infra*, pp. 18-19.) Nor do Plaintiffs satisfy their significant evidentiary burden merely by including the word "common" in leading deposition questions on tangential issues. (Pls.' Mov. Br. at 3:12-4:5.) Instead, *Wal-Mart* requires that any "common" issue be "central" to the validity of the claims, and that commonality be established with "significant proof." 131 S. Ct. at 2551, 2554.

Fourth, Plaintiffs have not shown that they can generate a common answer with regard to the science. Answering the question of whether one or more Emergen-C

15

products supports normal immune function would not answer the question of whether that product prevents a cold, prevents flu or shortens the duration or severity of either colds or flu.  Furthermore, Plaintiffs have no competent evidence to show this Court that they could generate any answers whatsoever on the science.  Instead of establishing the existence of classwide proof of falsity of Alacer's immunity claims through scientific data or expert testimony, Plaintiffs simply present a few irrelevant Alacer documents that they badly mischaracterize and distort.  Although *Wal-Mart* authorizes detailed scrutiny of a party's commonality proof, 131 S. Ct. at 2553-2556 (evaluating expert, anecdotal and statistical proof), even a cursory review demonstrates that Plaintiffs actually have no falsity evidence.  For example, to show that Alacer has a "disdain for a legitimate basis for its claims," (Pls.' Mov. Br. at 6:5), Plaintiffs quote an email from Chief Science Officer Dr. Robert Kay in which he states "junk science is almost as good as real science."  (Reese Decl., Ex. J.)  What they neglect to tell the Court is that this email chain is nothing but a joke on a new employee in which Dr. Kay describes in "scientific terms" a fake reaction between Emergen-C and soda to produce "embalming fluid."  This is crystal clear from the email chain itself, and both Dr. Kay and email recipient C.E.O. Ron Fugate explained the email in their depositions (which testimony Plaintiffs omit).  (*See* Paris Decl., Ex. 2 (Kay Dep. 134:17-135:16), Ex. 1 (Fugate Dep. 117:16-118:9).)  The humorous quip has nothing whatsoever to do with any Emergen-C immunity claim, as Plaintiffs misrepresent to the Court.  Certainly, it cannot establish the needed Rule 23(a) element of commonality.

Moreover, Mr. Kay's *email characterization* of a scientific study with regard to one ingredient in some Emergen-C products is not classwide evidence of falsity. (Reese Decl., Ex. E.)  Indeed, as discussed above, the referenced study (the Cochrane review) actually concludes that the ingredient, vitamin C, "is an efficient water-soluble antioxidant," has positive "effects on the immune system," and that scientific studies "have shown unambiguously that vitamin C has a physiological effect on the

duration and severity of colds." (Paris Decl., Ex. 14 (H. Hemila, et al., "Vitamin C for Preventing and Treating the Common Cold," at 4, 18); *see also supra* Section II.C.) Plaintiffs have simply failed to meet their commonality burden with a preponderance of evidence and their motion should be denied.

### D. Plaintiffs Are Not Typical Of Emergen-C Purchasers

Plaintiffs have also failed to meet their typicality burden. To establish typicality, Plaintiffs must demonstrate that: (1) "other members have the same or similar injury;" (2) "the action is based on conduct which is not unique to the named plaintiffs;" and (3) "other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (remanding to district court for renewed consideration of defendants' typicality arguments where each named plaintiff was subject to unique defenses). Certification "should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* at 984.

### 1. Each Plaintiff Is Subject To Unique Facts And Defenses

Plaintiff Gianino is atypical of the proposed class, because he believed that taking Emergen-C would "guarantee" that he did not get sick:

> Q.    And you thought you were ***guaranteed*** not to get a cold or flu by taking Emergen-C, right?
>
> A.    From what I bought, on the box, that was my belief, yes.

(Paris Decl., Ex. 3 (Gianino Dep. 400:7-11) (emphasis added).)

Indeed, Mr. Gianino repeatedly testified that "I bought the product because I believed that it ***was not going to allow me to get sick*** …." (*Id.* at 191:18-21 (emphasis added); *see also id.* 192:20-193:5 (I believed it was going to prevent me from getting sick.").) Mr. Gianino's belief that he was misled by a message that no reasonable person could infer from Emergen-C's packaging—amounting to "magical properties" of absolute sickness prevention—will require him to respond to unique defenses, thus, making him atypical. *See Mazur*, 257 F.R.D. at 568-69 (plaintiff did

17

1    not satisfy the typicality requirement, because she was subject to unique defenses,

2    including unreasonable reliance); *Arabian v. Sony Elec., Inc.*, No. 05-CV-1741 WQH

3    (NLS), 2007 WL 627977, at *4-*6 (S.D. Cal. Feb. 22, 2007) (typicality requirement

4    not satisfied because of unique defenses applicable to each named plaintiff, including

5    a potential statute of limitations defense).

6          Similarly, Plaintiff Risman is not typical of the proposed class, because she

7    purchased Emergen-C for an energy boost—not based on any immunity claims:

8          Q.   When you say it didn't do for you what you thought it would do,
9               what is it that you thought it would do that it didn't do?

10         A.   Um, well, **I thought I would get a boost of energy**, an increase in
11              my energy….

12         Q.   Can you explain to me basically, in your own words, what you
13              think you were promised by Emergen-C for the product that you
14              did not receive?

15         A.   … I originally bought it then, because I thought that it would just
16              give me that extra, um, boost of energy, um you know, after a long
              day….

17   (Paris Decl., Ex. 4 (Risman Dep. 38:20-39:11, 111:7-112:6) (emphasis added).

18         With respect to immunity, Emergen-C, in fact, met her expectations:

19         Q.   But other than the upset stomach, did [Emergen-C] fail to meet
20              your expectations in terms of immune function issues, like
              boosting your immunity or supporting your immunity?

21         A.   Um, no, not that I can recall.

22   (*Id.* at 83:24-84:5.)  Because Ms. Risman bought Emergen-C for a reason unrelated to

23   immunity (i.e., energy) and, critically, *does not claim that Emergen-C failed to meet*

24   *her expectations* regarding its immunity, Ms. Risman cannot represent a class

25   attempting to show that she was misled or by immunity claims on the Emergen-C

26   packaging.[11]  *See, e.g., Peviani v. Natural Balance, Inc.*, No. 3:10-cv-2451 AJB, 2011

27

28   ---
     [11]   Alacer notes that after referring to Emergen-C's unsatisfactory performance with regard to its
     energy benefits multiple times during her deposition, Risman added to one response that she also

WL 1648952, at *3 (S.D. Cal. May 2, 2011) (plaintiff who had bought the product for another was not typical or co-extensive with other customers, because her personal claims were only economic and the class claims were premised upon alleged health risks).

Finally, Plaintiff Lee is atypical, because he cannot prove that he is a member of the class, and all or most of his claims are barred by the statute of limitations. *See Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 621 (S.D. Cal. 2007). Mr. Lee testified that in any given year he would begin purchasing Emergen-C between September and November and cease using Emergen-C the following spring, usually between February and April. (Paris Decl., Ex. 5 (Lee Dep. 79:2-9).) Mr. Lee testified that he "distinctly remember[s]" using Emergen-C during only three winter seasons. (*Id*. at 222:3-6.) He "may" have begun purchasing the product in fall 2002, (*id*. at 221:13-22), meaning that his usage would have concluded at the end of the winter season that began in fall 2004—that is, spring 2005, before the class period begins. He later testified, specifically, to his Emergen-C purchase history, but still could not state definitively that he had purchased Emergen-C after October 2005:

> Q.   So going back then to when you first used [Emergen-C], whether it was 2002 or 2003, that would be one period, correct? ...
>
> A.   Yes.
>
> Q.   Then the next season would be September/November 2003 through February/March/whatever of 2004. That's season two, correct? …
>
> A.   Yes.
>
> Q.   Then season three would be … 2004 to 2005[?]

---

used the product to protect against colds and illnesses. (Paris Decl., Ex. 4 (Risman Dep. 81:6-13).) She admitted that there was nothing on the Emergen-C packaging that conveyed this message. (*Id*. at 99:5-100:2.)   Fundamentally, however, it is clear that Risman's overwhelming purpose in purchasing Emergen-C was energy, and that is the harm she complains about. (*See also id*. 104:23-105:12 ("it didn't work, you know, as far as giving me that energy boost, um, that it promised."), 107:23-108:5 ("the main reason is because, … I thought I would feel that, um, boost of energy."), *id*. 114:7-115-6 ("Q.  Did you ever come to the conclusion that some statement on the packaging of Emergen-C of the product that you purchased was false?  A.  Um, yes.  The, um, super energy booster, [] and then the [] part where it says 'burst of non-caffeinated energy.'").  Risman clearly will be "preoccupied" with the defense that her claim of injury is not that of the other class members. *See Ellis*, 657 F.3d at 984.

A.      Or it might have been 2005/2006.  *I do not recall.*

(*Id.* at 223:16-224:15) (emphasis added.)

At best, Mr. Lee's testimony paints an ambiguous picture of his Emergen-C purchase history.  Twice during his deposition Lee could not recall having purchased the product after October 2005.  Nor did he attempt to correct the deposition after he received the transcript and reviewed it.  Mr. Lee's inability to prove the date of his Emergen-C purchases subjects him to substantial attack and cross-examination designed to show that he is not, in fact, a member of the proposed class.  Moreover, it is not necessary that the Court determine the merits of this defense; that Mr. Lee will be subject to it is enough to render him atypical.  *Mazur*, 257 F.R.D. at 568-69 ("While the court need not, and does not, determine the merits of these defenses, the fact that Mazur may be subject to these defenses at all puts her in a different position from the rest of the putative class.")

Mr. Lee is also atypical because his claims are barred by the statute of limitations.  The statute of limitations for the UCL is four years, and three years for the CLRA, FAL, fraud, and negligent misrepresentation claims.  Cal. Bus. & Prof. Code § 17208; Cal. Civ. Code § 1783; Cal. Civ. Proc. Code § 338(d).  Plaintiffs initiated this action on October 27, 2009.  (Dkt. 1.)  Assuming that Mr. Lee first purchased Emergen-C in 2002 and stopped using the product in spring 2005, the last date for Lee to file his CLRA, FAL, and fraud claims would have been during the spring of 2008, and he would have had to file his UCL claim during the spring of 2009.  He thus would be time barred on all claims.  Even if he had begun purchasing Emergen-C in 2003 (the outside date) and stopped in spring 2006, every claim but the UCL is time barred.  Thus, Mr. Lee is also an unfit class representative.  *See Arabian*, 2007 WL 627977, at *4-*6 (potential statute of limitations defense renders plaintiff atypical).

Lee is subject to further problems as a class representative.  He used three different Emergen-C products.  The first is Lemon-Lime Original Formula; when Lee

20

bought this product in 2002 or 2003 (long before the latest possible date under any applicable statute of limitations), the only immune representation on it was that "Vitamin C is … involved in normal immune function," which is not even language Plaintiffs have challenged.  (Paris Decl. Ex. 5 (Lee Dep. 140:16-23, 52:25-53:4); Fugate Decl. ¶ 12 & Ex. 1).)  The other two are Specialty products that are designed and marketed to improve joint health, not for immune support, and Lee—a full-time yoga instructor—not surprisingly selected them for joint health reasons.  Emergen-C MSM is formulated "to aid in joint mobility" and the product Lee purchased contains no representations about immunity whatsoever.  (Paris Decl. Ex. 5 (Lee Dep. Ex. 5 at 61); Fugate Decl. ¶ 22 & Ex. 14.)  When asked why he had bought it, Lee testified he had "heard [MSM] was good for joints."  (Paris Decl. Ex. 5 (Lee Dep. 80:24-81:3).)  Lee also purchased Emergen-C Joint Health, a glucosamine and chondroitin supplement.  (*See id.* Ex. 5 (Lee Dep. Ex. 5 at 59-60).)  Lee testified that he started taking glucosamine and chondroitin products after "reading various accounts [in] Men's Fitness, Men's Health, CNN, etc."  (*Id.* Ex. 5 (Lee Dep. 76:4-8).)  He took the products to make his joints "a little less achy" (*id.* at 76:25) and used GNC brand as well as Emergen-C Joint Health.  (*Id.* at 77:16-18.)  Lee's present contention that he used these joint health products to prevent sickness renders him subject to unique arguments that are atypical of Emergen-C core product users.

Importantly, these defects render all of these Plaintiffs unfit to represent a class of core product purchasers.  Only two core products were purchased.  Lee's first generation version did not contain language challenged by the Plaintiffs in the FAC and is not actionable as a matter of law.  Risman bought her single box for its energy benefits.  Consequently, a class simply cannot be certified as to the largest component of Emergen-C products and purchasers.

## 2. Plaintiffs Purchased Only a Small Fraction of the Emergen-C Products They Seek To Include In The Putative Class

Plaintiffs also cannot establish typicality because they did not purchase all of

the products in their proposed class. "[A] named plaintiff that purchased a different product than that purchased by unnamed plaintiffs fails to satisfy the typicality requirement of Rule 23(a)(3)." *Wiener v. Dannon Co.*, 255 F.R.D. 658, 666 (C.D. Cal. 2009). Plaintiffs fail the typicality requirement to have a "broad composition of representative parties" that contains "a class representative … for each model of the product at issue." *Id*. (*citing Hanlon*, 150 F.3d at 1019-20.) Indeed, Plaintiffs' problem is even more fundamental—they lack standing to sue for products they did not purchase. *See Johns v. Bayer Corp*., No. 09CV1935 DMS (JMA), 2010 WL 476688, at *5 (S.D. Cal. Feb. 9, 2010) (plaintiff who purchased Men's Health vitamin lacked standing to pursue class relief under UCL or CLRA for purchasers of Men's 50+ vitamin, even though the challenged claims and ingredients-at-issue were the same); *Mlejnecky v. Olympus Imaging Am., Inc.,* No. 2:10-CV-02630 JAM-KJN, 2011 WL 1497096, at *4 (E.D. Cal. Apr. 19, 2011) (same).

Plaintiffs seek to represent a class of purchasers of all of Alacer's more than two dozen Emergen-C-branded products. But combined, Plaintiffs Gianino, Risman, and Lee claim to have purchased, at most, five different Emergen-C products.[12] Plaintiffs purchased only two, older versions of the Original Formula product. The immunity representations on these products differ materially from the claims on the later generations. One is the first generation (purchased by Lee), which says only that "Vitamin C is … involved in normal immune functioning." *Supra*, p.6. The other is the second generation, which describes the immunity benefit in connection with the "fall/winter" season, purchased by Risman. *Supra*, p.6. No other version describes the immunity benefits in terms of seasons. In contrast, versions *not* purchased by the Named Plaintiffs include the fourth, fifth and sixth generations, which use only the FDA-endorsed phrase "supports immunity." *Supra*, pp. 6, 8-11. Fundamentally, there

---

[12]   Mr. Gianino purchased Emergen-C Immune Defense.  (Paris Decl., Ex. 3 (Gianino Dep. 41:2-20).) Ms. Risman purchased Emergen-C Lite. (*Id.,* Ex. 4 (Risman Dep. 31:21-33:19 & Ex. 5).)  Mr. Lee purchased Emergen-C Original, MSM, and Joint Health.  (*Id.,* Ex. 5 (Lee Dep. 78:19-81:3 & Ex. 5).)

are material differences across the Original Formula generations, and Plaintiffs have presented no evidence that Risman and Lee's purchase of earlier, different generations make them adequate representatives of customers who have bought these later (and larger selling) generations. *See Bruno,* 2011 WL 5592880, at *7 (in dietary supplement case, plaintiff not "typical of class members exposed to representation that product is '3x' more absorbent because plaintiff exposed only to the representation product has '6x BETTER ABSORPTION.'").

Moreover, the Named Plaintiffs' purchases do not adequately cover the Emergen-C product line from a functional perspective. As described above, Emergen-C products are formulated for numerous purposes other than immune support, including bone health, heart health, and electrolyte replacement. *Supra*, II.B.2. In total, the Named Plaintiffs purchased only three Specialty products: one version of MSM that did not contain any immunity representations and therefore cannot be a basis for class claims, one version of Joint Health, and Immune Defense. *Supra*, p.22, n.12.

In addition, the Named Plaintiffs are inadequate to represent an "all products, all purchasers" class because Emergen-C product formulations vary. For example, no plaintiff purchased Immune+, which (as explained above) contains a proprietary immune complex not present in other Emergen-C products. Thus, the claims of plaintiffs who purchased Immune+ "are not fairly encompassed by [Plaintiffs'] claims."[13] *Wiener*, 255 F.R.D. at 666 (denying certification on typicality grounds where plaintiff who purchased one variety of yogurt but not another could not represent a class of all purchasers, because "different studies allegedly substantiate these health benefits … [and] lead to a substantial divergence in the evidence required to prove the claims.")

---

[13] For evidence of this, the Court need look no further than Plaintiffs' interrogatory responses, in which the scant evidence in support of Plaintiffs' contentions is solely articles (including one from USA Today) addressing Vitamin C's effect on cold prevention. (*See e.g.*, Paris Decl., Ex. 6 (Gianino Resp. to First Interrog. No. 10).)

### E.   Plaintiffs Are Not Adequate Representatives

Rule 23(a)(4) requires Plaintiffs to show that the Named Plaintiffs will be able "to adequately and fairly represent" the members of the proposed class.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see Ellis*, 657 F.3d at 985 ("Adequate representation depends on … an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees.").

Here, there are conflicts of interests between the Named Plaintiffs and the absent class members, because, as explained above, each of the Named Plaintiffs is subject to unique defenses and Plaintiff Risman has alleged a different injury than the proposed class.  Thus, Plaintiffs have not satisfied the adequacy requirement.  *See Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("The named plaintiffs thus may not be able to provide adequate representation for those who have suffered different injuries."); *Peviani*, 2011 WL 1648952, at *4 (adequacy requirement not satisfied where named plaintiff suffered different injury than absent class members); *Gartin v. S & M Nutec LLC*, 245 F.R.D. 429, 434 (C.D. Cal. 2007) ("adequacy of representation may be defeated when litigation of the matter could be overwhelmed by disposition of unique defenses.").

### F.   Individualized Issues Predominate

Beyond Plaintiffs' fatal failure to satisfy the Rule 23(a) factors, they cannot satisfy the requirements of Rule 23(b)(3), which is their sole ground for certification. Plaintiffs fail the predominance factor because their evidence does not establish that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.  "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).   The record here establishes that Plaintiffs' claims require individualized inquiries into consumer intent, materiality, reliance and causation.

Plaintiffs cannot rely on allegations alone, but must provide evidence of predominance, which is lacking here.  *See Gartin*, 245 F.R.D. at 435 ("A plaintiff must provide evidence in support of its claim that Rule 23(b)(3) has been satisfied; mere promises that issues relating to predominance or superiority can be overcome are inadequate.")

## 1.   The Challenged Immunity Claims Were Not Made To The Entire Class, Defeating Certification Of All Claims

"[A] class action cannot proceed for a fraudulent business practice under the UCL when it cannot be established that the defendant engaged in uniform conduct likely to mislead the entire class.  Specifically, when the class action is based on alleged misrepresentations, a class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class."  *Fairbanks v. Farmers New World Life Ins. Co.,* 197 Cal. App. 4th 544, 562 (2011); *see also Cohen v. DirecTV, Inc.*, 178 Cal. App. 4th 966, 980 (2010) ("we do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice"); *Stearns*, 655 F.3d at 1020 (noting "it might well be that there was no cohesion among the [class] members because they were exposed to quite disparate information …"); *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 536 (S.D. Cal. 2011) (finding lack of classwide exposure to the allegedly false advertising fatal to certification in UCL and CLRA matter).

As explained above at Section II.B.2, Plaintiffs' proposed class includes putative class members who purchased products that did not contain *any* immunity representation on the packaging.  Other putative class members purchased products with only immune statements regarding "normal immune function," and still other putative class members purchased products for a specific functional health need such as Joint Health, which contains an immune representation that is incidental to the

product's purpose.  *Supra*, II.B.  Plaintiffs thus cannot establish by common proof classwide exposure to—let alone reliance on or causation from—an allegedly misleading representation.

Plaintiffs reliance on *Johnson v. General Mills*, 275 F.R.D. 282 (C.D. Cal. 2011), is misplaced.  In *Johnson*, each of the three versions of YoPlus product packaging sold during the class period contained express digestive health claims prominently displayed on the front of the packaging, and the evidence showed that consumers bought and paid a significantly higher price for YoPlus than regular Yoplait yogurt.  By contrast, here, not all customers purchased a product containing an immunity claim, and none purchased a product with the implied cold and flu remedy claim that is the centerpiece of Plaintiffs' case.  Nor is there any evidence customers paid a higher price for Emergen-C than other immune support products.

> **2.    Certification of All Claims Is Defeated Because The Materiality Of The Challenged Claims Varies And Is Not Subject To Classwide Proof**

Materiality is required for false advertising claims brought under California's consumer protection statutes and common law fraud laws.  *See Farmers*, 197 Cal. App. 4th at 565 ("To be actionable, a misrepresentation must be material.").  A representation is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *In re Tobacco II Cases*, 46 Cal. App. 4th 298, 327 (2009).  Notwithstanding this "objective" standard, a representation's materiality is not susceptible to common proof if the record shows that the materiality of the representation varies among class members or that the representation was not a factor in consumers' purchasing decisions.  *Farmers*, 197 Cal. App. 4th at 565 (affirming denial of certification of UCL, negligent misrepresentation and fraud class:  "While we acknowledge that materiality is considered pursuant to the objective standard identified above, we agree with the trial court that the issue is nonetheless subject to

individual proof in the circumstances of this case."); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 667 (1993) (affirming trial court's denial of class certification in UCL and CLRA case where "the existence of a material misrepresentation was not a common issue"). This proposition is well established. *See Stearns*, 655 F.3d at 1022-23 ("If the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified.").

In *Caro*, a widely-cited and influential case, the California Court of Appeal upheld denial of certification where variations in individual orange juice purchasers' understandings of the meaning of "fresh" and "contains no additives" meant that individual issues of materiality predominated. *Caro*, 18 Cal. App. 4th at 668 ("the court properly concluded the issue whether any asserted misrepresentation induced the purchase of Citrus Hill Fresh Choice orange juice would vary from consumer to consumer"), 655 (lack of predominance analysis applicable to UCL and CLRA claims). The recent *Farmers* decision is also significant. In that case, plaintiffs brought UCL and common law fraud claims challenging Farmers' marketing of universal life insurance as "permanent," when in fact it would expire before maturity on the payment plan offered. The court upheld denial of certification because of variation in materiality where survey evidence indicated that half of the putative class was not concerned with the permanence of the policy; they purchased it for other reasons. *Farmers*, 197 Cal. App. 4th at 565.

Here, Plaintiffs offer no evidence that the allegedly implied false message of cold and flu prevention or treatment was perceived by all putative class members or is capable of resolution by common proof. Nor do they provide evidence such a message would be material to all class members. Plaintiffs point to a single 2008 marketing survey in which consumers reported that they used "Emergen-C" for "immune protection" reasons. (Reese Decl., Ex. D.) As discussed previously, this ambiguous statement does not establish that all consumers take all Emergen-C

27

products for cold/flu prevention reasons.  "Immune protection" is undefined, and Plaintiffs do not explain what Emergen-C products are included in the survey, the methodology of that survey, or indeed offer the slightest foundation upon which the Court could base a decision.  To be sure, if Plaintiffs wish to rely on such marketing surveys, they must acknowledge that half of Emergen-C customers use the product year round, not as a seasonal cold remedy.  (Fugate Decl. ¶ 39 & Ex. 28.)  Plaintiffs also cite their own deposition testimony, but as discussed above, (1) Risman did not purchase Emergen-C for its immunity benefits and was not dissatisfied with its immunity support, (2) Lee's claims based on his core product purchases are clearly time barred, and the core product he purchased contains language ("involved in normal immune function") that is undeniably true and is not even challenged in this case, and (3) Gianino bought a Specialty Immune Defense Formula product only, and derived a magical belief in its immune-strengthening properties.  *Supra*, Section III.D. There is no basis to conclude Original Formula product purchasers construe either "boost" or "support" immunity as cold preventative.

Risman's testimony is evidence that the materiality of the claims requires an individual inquiry, as in *Caro*.  Risman's purpose in buying the product was not immunity, but energy; consequently, the truth or falsity of the immunity claims, express or implied, would not have affected her purchase.

### 3. Plaintiffs' CLRA and Fraud Claims Cannot Be Certified Because Of Individualized Issues of Reliance and Causation

#### a. CLRA Claim

The CLRA requires that plaintiffs "show not only that a defendant's conduct was deceptive but that the deception caused them harm."  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009); *Wilens v. TD Waterhouse Group, Inc.*, 120 Cal. App. 4th 746, 754 (2003) ("causation [is] a necessary element of proof."); Cal.Civ.Code § 1780(a).  Plaintiffs have not and cannot establish that all Emergen-C

customers have construed and relied on an implied cold prevention/treatment message when purchasing the diverse Emergen-C products included in the class definition.

**Inference of reliance rebutted.**   Plaintiffs' contention that reliance may be inferred in this case (Pls.' Mov. Br. at 18:5–20:27), must be rejected for two reasons. First, a classwide inference of reliance is permitted only "*when the same material misrepresentations have actually been communicated to each member of a class*." *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1095 (1993).   Here, Plaintiffs challenge products with no representations regarding immunity at all, and even where there are immunity representations, class members have not been exposed to a single, uniform representation that can be addressed by common proof.[14]  *See Campion*, 272 F.R.D. at 538; *Gonzalez*, 247 F.R.D. at 626.

Second, the inference of reliance based on the alleged materiality of the challenged claim language is rebuttable with evidence.  *See Vasquez v. Super. Ct.*, 4 Cal. 3d 800, 805 (1971); *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011) (denying certification where defendants rebutted inference of classwide materiality of alleged omission).   Notably, Plaintiffs offer no evidence that anyone besides themselves understand the challenged claims to mean prevents "cold and flus." Plaintiffs offer neither a consumer survey nor individual evidence of customer intent and behavior.  By contrast, the record shows that consumers purchase Emergen-C products for a variety of reasons unrelated to any immune benefit.  (Fugate Decl. ¶¶ 32-34 & Ex. 27.)   Approximately one-third of Emergen-C customers purchase Emergen-C products for energy benefits.  (*Id.* ¶ 33.)  Indeed, one of the Named Plaintiffs testified that she purchased an Emergen-C product for its energy benefits. (*See* Paris Decl., Ex. 4 (Risman Dep. 38:20-39:11).)   Similarly, the unsolicited consumer feedback provided to Alacer concerning Emergen-C products further

---

[14]   Plaintiffs' reliance on *Mass. Mutual Life Ins. Co. v. Super. Ct.*, 97 Cal. App. 4th 1282 (2002), is misplaced.   In *Mass. Mutual*, plaintiffs' claims were based on an alleged non-disclosure which is necessarily uniform, rather than an affirmative misrepresentation that was not common to all class members.  *Id.* at 1286.

demonstrates that there are a variety of reasons why people purchase Emergen-C, including:

- Electrolyte replenishment
- Physician's recommendation
- Alternative to swallowing vitamin tablets
- General vitamin supplement
- As part of a healthy general lifestyle

(Fugate Decl. ¶ 34 & Ex. 27.)  Class members who purchased Emergen-C products for reasons other than colds and flus prevention and treatment cannot show reliance and causation based on Alacer's immunity claims.

Moreover, Plaintiffs cannot establish reasonable reliance classwide, because each Emergen-C product contains an express statement contradicting the implied cold and flu message Plaintiffs wish to ascribe to it:  "This product is not intended to diagnose, treat, cure or prevent any diseases."  (*Id.* ¶ 30.)  A reasonable consumer would not purchase Emergen-C to prevent colds and flus, when it explicitly states that is not its purpose.  Each Named Plaintiff testified that he or she had not read this statement, or did not recall reading it.  (Paris Decl., Ex. 3 (Gianino Dep. 208:6-209:6 ("I didn't pay attention to that."), Ex. 5 (Lee Dep. 210:23-211:17, 213:6-23), Ex. 4 (Risman Dep. 95:17-96:13).)  Causation cannot be determined classwide, because consumers who did read the disclaimer likely had a different, and correct, understanding of the product's purpose.  *Caro* involves a similar fact pattern.  Although he alleged the orange juice label was misleading, plaintiff failed to read the explicit statement on it that clarified that water had been added.  The court held "it would be a matter of individualized proof whether the claim of 'no additives' constituted a material misrepresentation to class members who—unlike Caro—read the portions of the label stating 'from concentrate.'"  18 Cal. App. 4th at 668.  Similarly, in another false advertising case, the court denied certification where the plaintiff failed to read the instructions on the product packaging, "putting her in a

different position than many other proposed class members.  Thus, causation could not be determined on a class-wide basis." *Gartin*, 245 F.R.D. at 440.

***Reliance cannot be shown for products with a Specialty purpose.***  Classwide reliance on the challenged language also cannot be shown on the wide array of Specialty products include within the class with a primary purpose distinct from Emergen-C Original Formula.  For example, although a generation of Joint Health states, "boosts immunity" on the back panel (other generations had no immunity claims), the primary claim is that it is a glucosamine and chondroitin supplement to improve joint health; these ingredients are featured on the front of the packaging and in the highlighted panels on the back.  Even the benefits of vitamin C are oriented not toward immunity, but its effect on developing collagen.  *Supra*, Section II.B.2. Plaintiffs, consistent with their approach to this motion, have offered no evidence, or even an argument, to establish that it can be shown by common proof that all customers purchase Specialty products to prevent colds.  Although certain Specialty products contain immunity representations, many of these products are formulated and marketed toward a specific functional health purpose—and there is no evidence in this record that consumers generally purchase those products for prevention or treatment of the common cold.  (Fugate Decl. ¶ 18.)

That this is an individual question, depending on the facts and circumstances of each customer, is made plain by the testimony of Plaintiff Lee.  Lee testified that he first used Emergen-C Original Formula Lemon-Lime, purportedly for cold prevention. (Paris Decl., Ex. 5 (Lee Dep. 139:24-140:23).)  Lee then allegedly attributed the cold prevention message he inferred from Original Formula to Joint Health because it was an Emergen-C brand, and he had been using Original Formula previously:  "Q.  Why were you using Joint Health during the winter season?  A.  I was using Emergen-C.  It just happened to be Joint Health Emergen-C."  (*Id*. at 202:4-7.)  Lee was not clear whether he even read the label for Joint Health, because "it was in my mind that Emergen-C boosts immune system according to their claims."  (*Id*. at 203:23-204:3.)

31

1   Thus, Lee's belief about Joint Health was based not on representations on *its* label, but

2   on his prior experience with another product.  Such idiosyncratic circumstances are

3   one of the many reasons why materiality, reliance and causation must be determined

4   individually.

5   **b.    Intentional/Negligent Misrepresentation Claims**

6       "A [common law] fraudulent deception must be actually false, known to be

7   false by the perpetrator and reasonably relied upon by a victim who incurs damages."

8   *In re Tobacco II Cases*, 46 Cal. 4th at 312 (internal citation omitted).  The elements of

9   a negligent misrepresentation claim are the same, except that it does not require

10  science or intent to defraud.  *Wells Fargo Bank, N.A. v. FSI, Fin. Solutions, Inc.*, 196

11  Cal. App. 4th 1559, 1573 (2011).  For the same reasons Plaintiffs cannot establish

12  classwide proof of a CLRA violation, including that justifiable reliance requires an

13  individualized inquiry given that each product disclaims that it is intended to prevent

14  or treat sickness or disease, Plaintiffs cannot show reliance and causation by common

15  proof for their intentional and negligent misrepresentation claims.

16      Moreover, courts rarely certify common law fraud claims because of the many

17  individualized factual issues that must be determined.  *See Gartin*, 245 F.R.D. at 439

18  ("class certification for the fraud claim is precluded due to the individual legal issues

19  with regard to reliance and choice of law"); *Sanders v. Apple Inc.*, 672 F. Supp. 2d

20  978, 991 (N.D. Cal. 2009) (courts "routinely hold that … fraud … claims are difficult

21  to maintain on a nationwide basis and rarely are certified."); *Martin v. Dahlberg*, 156

22  F.R.D. 207, 217 (N.D. Cal. 1994) ("individualized questions of reliance" precluded

23  certification of plaintiffs' common law fraud and negligent misrepresentation claims).

24      Plaintiffs' reliance on *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*,

25  No. SACV 07-1306 JVS (RNBx), 2008 WL 4906433 (C.D. Cal. Nov. 13, 2008) is

26  misplaced.  In *Rivera*, the district court *denied* certification of a nationwide fraud class

27  under Rule 23(b)(3).  *Id.* at *2-*3 ("this Court declines to apply California law to a

28  nationwide … fraud class pursuant to Rule 23(b)(3).").   The *Rivera* court's

certification of a California-only fraud class was based on ample evidence of commonality not present here.  In *Rivera*, unlike in this case, plaintiffs provided evidence that the challenged claim appeared on the labels of each of the products at issue and submitted declarations from 46 individuals showing reliance.  *Id.* at *9.

### G.  Certification Of A Nationwide Class Under California Law Is Improper

The nationwide application of California law is not permitted under the facts of this case.  Plaintiffs' citations to a few authorities where courts have adopted a nationwide class based on California law are unpersuasive, because they lack the "rigorous analysis" required of choice of law determinations or are otherwise distinguishable.[15]  *See Zinser*, 253 F.3d at 1186.  By contrast, the California Supreme Court recently issued an authoritative decision—uncited by Plaintiffs—that engages in a rigorous choice-of-law analysis and finds that a foreign state's interests outweighs California's under the governmental interest test.  *See McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68 (2010). Certification should therefore be denied both because there is no viable class representative (absent a Californian), and Plaintiffs have offered no manageable plan for a class in which 50 states' laws would have to be applied.  *Zinser*, 253 F.3d at 1189.

### 1.  There are Material, Outcome-Determinative Differences Between The Laws Of The Various States

There are outcome-determinative, material differences among laws that weigh heavily against the nationwide application of California law.  To illustrate these differences, Alacer has attached comprehensive nationwide survey charts, detailing the variances in the states' consumer protection and fraud laws.  (Paris Decl., Exs. 15,

---

[15]  *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 485 (N.D. Cal. 2011) (*Nedlloyd* analysis based on choice of law provision contained in warranty—not governmental interest analysis); *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010) (analysis limited to first step); *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (analysis limited to due process); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal. 2008) (analysis limited primarily to due process); *see also Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001) (certification in a settlement context).

16.)  While space does not permit an exhaustive discussion of every difference, we summarize the key differences below:

### a.    Consumer Protection Statutes

Courts have routinely recognized that the consumer protection statutes among states vary in material ways.  *See, e.g., In re Hitachi Tele. Optical Block Cases*, No. 8cv1746 DMS (NLS), 2011 WL 9403, at *6 (S.D. Cal. Jan. 3, 2011) ("there are material conflicts between California's consumer protection laws and the consumer protection laws of the other forty-nine states"); *see also In re Bridgestone/Firestone, Inc.*, 288 F. 3d 1012, 1018 (7th Cir. 2002) ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to [activities] in other states with different rules.");  *In re Grand Theft Auto Video Game*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) ("Most of the courts that have addressed the issue have determined that the consumer-fraud … laws in the fifty states differ in relevant respects.").

The following is illustrative of some of the differences among the states' consumer protection laws:

- Injury/Deception Requirements:  States have different injury and deception requirements.  While the majority of states require proof of an injury, at least 2 states, DE and NM, as well as D.C., have no injury requirement.  Other states such as ME require a "substantial injury."  Similarly, while many states do not have a deception requirement, other states such as **IL** require proof of actual deception.

- Scienter Requirement:  At least 9 states require some degree of scienter for a consumer protection claim, including CO, KS, MS, NV, SD, UT, VA, WI, WY.  Other states such as PA require knowledge or reckless disregard.

- Reliance/Causation:  At least 8 states include a reliance requirement in their consumer protection laws, including AZ, **CA**, IN, OR, PA, VA, WV, WI; whereas, other states do not require a showing of reliance, including AL, CT, DE, **IL**, **MA**, **NH**.  *See Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008) ("several states' consumer fraud laws require proof of deception or reliance, thus precluding class certification").

34

- <u>Pre-suit notice/demand letter required</u>:  At least 7 states require a plaintiff to send pre-filing notice to defendant in order to file a claim, including AL, GA, IN, **MA**, TX, WY.  Failure to comply with this requirement is grounds for dismissal.  *See, e.g., In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1327 (S.D. Fla. 2010) (dismissing plaintiffs' claim brought under Massachusetts' Consumer Protection Act for failure to comply with its pre-suit notice requirement).  No such demand was made in this case.

- <u>Statutes of Limitations</u>:  Statutes of limitations for consumer protection laws vary significantly from 1 to 10 years among the states:  1 year (AZ, LA); 2 years (AK, ID, IN, KY, OH, TX, VA); 3 years (**CA** (CLRA, FAL), CT, CO, D.C., DE, **IL**, KS, MD, **NH**, NY, WI); 4 years (**CA** (UCL), FL, GA, HI, **MA**); 5 years (AR, MO); 6 years (ME, MN, NJ, ND, PA, VT); 10 years (RI).  *See In re Toyota Motor Corp.*, 785 F. Supp. 2d 925, 933 (2011) (noting statutes of limitation as material difference among state consumer protection statutes).

- <u>Class Actions/Private Right of Action</u>:  Some states do not permit class actions under their consumer protection laws, including AL, LA, MS, MT, SC, TN, VA.  Other states primarily restrict class actions to state residents, including CT and **IL**.  At least one state, Iowa, does not recognize a private right of action under its consumer protection law.

- <u>Remedies/Relief</u>:  There are also material variations in the remedies available under the states' consumer protection laws.  While some states permit recovery of damages, including AZ, AK, HW, **IL**, IN, **MA**, NH, RI, SD, TX; other states limit the available remedies to equitable or restitutionary relief , including **CA** (UCL, FAL), GA (UDTPA), UT.  In addition, at least 8 states do not permit punitive damages, including **CA** (UCL, FAL), LA, ME, MO, NJ, SC, SD, TN.

(*See* Paris Decl., Ex. 15.)

These conflicts of law are material and directly impact the claims in this litigation.  For example, if Gianino, who originally brought suit in Illinois, had continued to pursue his claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505 *et seq.*, each class member would have been required to show actual deception in order to recover, and the class would have been limited to Illinois residents.  *See Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 59-60 (2007) (noting material conflicts of law between Illinois and California's consumer protection statutes, including actual deception requirement); *Avery v. State*

1    *Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 186 (2005) (holding that the ICFA applies

2    only to fraudulent transactions which take place "primarily and substantially" in

3    Illinois).   Similarly, if Plaintiff Lee had filed suit under Massachusetts' Consumer

4    Protection Act, Mass. Gen. Laws ch. 93A, § 1 *et seq.*, he would have been required to

5    send Alacer a pre-suit demand letter at least 30 days prior to filing his action (which

6    did not occur).  *See* Mass. Gen. Laws ch. 93A, § 9(3).  Finally, if Plaintiff Risman had

7    filed suit under New Hampshire's Consumer Protection Act (CPA), N.H. Rev. Stat.

8    Ann. § 358-A:1 *et seq.*, her claims would have been subject to a significantly higher

9    standard of proof.  *See Barrows v. Boles*, 687 A. 2d 979, 986-87 (N.H. 1996) (under

10   the CPA, "[t]he objectionable conduct must attain a level of rascality that would raise

11   an eyebrow of someone inured to the rough and tumble of the world of commerce.");

12   *Evans v. Taco Bell Corp.*, No. Civ. 04CV103JD, 2005 WL 2333841, at *12 (D. N.H.

13   Sept. 23, 2005) ("Such a vague account of the content of Taco Bell's advertising

14   simply cannot support a Consumer Protection Act claim based on Taco Bell's

15   allegedly false statements.").

16                  **b.       Intentional/Negligent Misrepresentation Laws**

17             Any argument that fraud claims are essentially the same nationwide and that

18   any variances in law are immaterial must be rejected.  As explained above (at pp. 32-

19   33), courts rarely certify common law fraud claims—let alone nationwide fraud

20   claims.  *See Rivera*, 2008 WL 4906433, at *2 (concluding that there are material

21   conflicts between the California law of fraud and the laws of other states, including

22   differences in scienter for fraud); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672,

23   674 (7th Cir. 2001) (reversing certification of nationwide fraud class and noting that

24   differences in fraud laws "cut strongly against nationwide classes").

25             The following is illustrative of some of the differences between the states'

26   intentional and negligent misrepresentation laws:

27       • Scienter:  There is a split among the states as to whether a defendant must

28              knowingly make a material misrepresentation or whether reckless disregard of

the truth of the representation is sufficient for an intentional misrepresentation claim. 19 states require scienter for an intentional misrepresentation claim, including AK, **CA**, CO, CT, FL, **IL**, **MA**, NJ, NY, OR, VT, WV; whereas, 31 states do not have a scienter requirement, including AZ, IN, MI, MO, NV, **NH**, ND, OH, PA, TX, WY.

- <u>Standard of Proof</u>:  There are significant differences among the states regarding the standard of proof.  Some states require a plaintiff to prove a fraud claim by "clear and convincing evidence," including CO, CT, FL, **IL**, **MA**, **NH**, NY, PA, WV; whereas, other states require a plaintiff to prove a fraud claim by a "preponderance of evidence," including AK, **CA**, DE, IN, NC, RI, TN, TX, WY.

- <u>Intent</u>:  At least 5 states do not require a plaintiff to show that defendant had intent to induce reliance on a material misrepresentation for a common law fraud claim, including AL, CO, TN, VT, WV.

- <u>Statutes of Limitations</u>:  Statutes of limitations for intentional and negligent misrepresentation laws vary significantly from 1 to 6 years among the states:  1 year (LA); 2 years (AL, KS, OK, PA, TX (negligent)); 3 years (**CA**, CO, **MA**, **NH**, SC, WA); 4 years (FL, NM, OH, TX (intentional)); 5 years (**IL**, IA, MO); 6 years (HW, IN (intentional), NY, VT).

- <u>Calculation of Damages</u>:  States apply different methods of calculating damages for misrepresentation claims.  Some states use a "benefit of the bargain" method based upon plaintiff's expectation damages, including AZ, **CA**, CO, **IL**, KS, **MA**, **NH**, TX.  Some states use an "out of pocket" method which allows a plaintiff to recover only reliance damages, including LA, MN, NY, PA, WY. Other states take a "flexible" approach to calculating damages, including FL, ID, IO, MD, NJ, VT, WA.

(*See* Paris Decl., Ex. 16.)  In addition, the tort of negligent misrepresentation does not even exist in at least three states.[16]  (*Id.*)

Based on the significant differences discussed herein and in the accompanying surveys of law, it is clear that material conflicts of law exist.

---

[16]  Arkansas, Indiana, and Idaho.

2.    **Other States Have Significant Interests In This Litigation**

When there are material conflicts of law, the trial court must "determine what interest, if any, each state has in having its own law applied to the case." *Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 920 (2001).    Plaintiffs contend that California's interest is "protecting its citizens from unlawful conduct," plus "regulating a domestic corporation."  (Pls.' Mov. Br. at 24:10-11.)  The first interest, of course, does not justify imposing California law in a suit brought by non-Californians; it is easily served by permitting Californians to sue on behalf of Californians, which this case decidedly is not.  With their second, vaguely-stated interest, Plaintiffs appear to contend that mere California domicile is sufficient to give California an interest in imposing its law outside of California; again, this interest is served by regulating domestic conduct and activity.

On the other side of the coin, even Plaintiffs do not dispute that "every state has an interest in protecting its citizens from unlawful conduct."  (*Id*.)  Moreover, each state has an interest determining the scope of consumer protection within its borders, and balancing that protection with business interests.  *Lewallen v. Medtronic USA, Inc.*, No. C 01-20395 RMW, 2002 WL 31300899, at *5 (N.D. Cal. Aug. 28, 2002) ("each of the fifty states may have an interest in seeing that its law is applied in an action involving one of its own injured citizens"); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 348 (D. N.J. 1997) ("Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws"); *see also LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1072 (3d Cir. 1996) ("A state's interest in enforcing its tort law is not constrained in protecting residents from harm or suit .... A state could have a host of reasons for limiting liability, including encouraging economic activity in the state … and lowering costs to consumers.").  As set forth above and in the attached exhibits, the laws of the states reflect careful policy judgments that are protective not only of consumer interests, but

38

also of the businesses operating within those states.  *See In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 371 (E.D. La. 1997) ("It is simply incorrect to assume that the overriding interest in all consumer-oriented cases is protection of the consumer.   The policies of each state with contacts must be examined.").   These balances are reflected in statutes of limitations, limitations on private rights of actions and class actions, requirements for pre-suit demands, burdens of proof, and the like.  These differences reflect the diversity of state interests that must be recognized in the second stage of the California governmental interest analysis.  *See Grand Theft Auto*, 251 F.R.D. at 150 ("each state has a compelling interest in having its own consumer-protection laws applied to transactions occurring within its borders").

Plaintiffs do not seriously contend that other states have no interest in applying their laws to govern retail transactions that occur in those states, where citizens of those states purportedly suffered an injury.[17]   To be sure, any contrary argument has been squarely rejected in a recent decision by the California Supreme Court.   In *McCann v. Foster Wheeler LLC*, the California Supreme Court reversed the Court of Appeal, which had applied California instead of Oklahoma law, incorrectly reasoning that Oklahoma did not have any significant interest in applying its "business friendly" law.  48 Cal. 4th at 91-92.  The *McCann* Court explained:

> A state has a legitimate interest in attracting out-of-state companies to do business within the state, both to obtain tax and other revenue that such businesses may generate for the state, and to advance the opportunity of state residents to obtain employment and the products and services offered by out-of-state companies.  **In the absence of any explicit indication that a jurisdiction's "business friendly" statute or rule of law is intended to apply only to businesses incorporated or headquartered in that jurisdiction … the state's interest in having that law applied to the activities of out-of-state companies within the jurisdiction is equal to its interest in the application of the law to comparable activities engaged in by local businesses situated within**

---

[17] Indeed, Plaintiffs' own authority acknowledge at least this much.  *See Wolph*, 272 F.R.D. at 486 (quoting *In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. at 348).

1  **the jurisdiction.**

2  *Id.* (emphasis added.)  In short, other jurisdictions have legitimate interests in enacting

3  and applying their own laws to commercial activity within their state – *even if* those

4  laws are more "business-friendly" than California and *even if* the defendant is based in

5  California.

6          **3.    Other States' Interests Would Be "More Impaired" If**

7                 **California Law Applied**

8          Under the third and final step, the court must determine "which state's interest

9  would be more impaired if its policy were subordinated to the policy of the other

10  state." *Offshore Rental,* 22 Cal. 3d at 164-65.  This "does not involve the court in

11  'weighing' the conflicting governmental interests 'in the sense of determining which

12  conflicting law manifest[s] the 'better' or the 'worthier' social policy on the specific

13  issue." *Id.* at 165.  *See also McCann,* 48 Cal. 4th at 97 ("our task is not to determine

14  whether the Oklahoma rule or the California rule is the better or worthier rule, but

15  rather to decide—in light of the legal question at issue and the relevant state interests

16  at stake—which jurisdiction should be allocated the predominating lawmaking power

17  under the circumstances of the present case.")   Although Plaintiffs argue that

18  California laws are stronger and thus should prevail (Pls.' Mov. Br. at 26:11-20), it is

19  improper to select California law simply because California provides a better remedy

20  for consumers than other states, as some courts have erroneously done.  *E.g., Mazza*,

21  254 F.R.D. at 623.[18]  This is because, as discussed above, states have interests beyond

22  the protection of consumers.  *See In re Ford Motor Co. Bronco II*, 177 F.R.D. at 371

23  ("plaintiffs' cryptic argument that any state whose consumer laws are more rigorous

24  than Michigan's must surrender to the application of Michigan law overlooks the fact

25  that there might be important policy reasons behind a state's adoption of more

26

27  _____

28  [18]   This case is now on appeal and currently pending before the Ninth Circuit.  Notably, neither the
Ninth Circuit nor the California Supreme Court has upheld a nationwide California law consumer
fraud case.

restrictive consumer-oriented laws, and that application of Michigan law might actually impair these states' policies."); *see also* Larry Kramer, Rethinking Choice of Law, 90 Colum. L. Rev. 277, 297-300 (1990) (enumerating various policies apart from consumer protection that can underlie a state's laws).

In support of their claim that California's interest is paramount, Plaintiffs rely heavily on an older California appellate case, *Clothesrigger v. GTE Corp.*, 191 Cal. App. 3d 605 (1987). *Clothesrigger* cannot bear the weight Plaintiffs put on it. First, that court *did not* uphold or compel the nationwide application of California law; it reversed the trial court, which had failed to perform *any* choice of law analysis. *Id*. at 611. The appeals court remanded, because of a "focus on correct process" "even though there may be substantial evidence to support the court's order [denying certification]." *Id*. The trial court "did not identify *any* interest any other state might have in application of its own law to plaintiffs residing there. Neither did the court find any other state had an interest overriding California's interest. Instead, the court apparently assumed California law was not likely to apply and other states' law would apply merely because a nationwide class would include residents of other states." *Id*. at 615-16 (emphasis added). Here, each state *has* an interest in applying its own blend of consumer protection laws in this dispute. *Supra*, pp. 38-40. The *Clothesrigger* Court went on to state "the court simply erred in stating that California has no interest in providing plaintiffs greater protection than their home states provide. California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying them full recovery." *Id*. Plaintiffs quote this same passage. (Pls.' Mov. Br. at 26:17-20.) In the wake of *McCann*, however, this "California *über alles*" theory clearly cannot survive. As *McCann* illustrates, other states have interests *besides* giving consumers "full recovery"— whatever that means—which include balancing business interests, such as limiting the

1    statutes of limitations, rights of actions, burdens of proof, etc.[19]

2         Essentially all of Plaintiffs' analysis purportedly under the third, comparative

3    impairment prong is incorrectly confused with considerations relevant to the due

4    process analysis under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).  For

5    example, Plaintiffs contend that *Clothesrigger* demonstrates that there is a "sufficient

6    aggregation to contacts … to permit applying California law to the claims of non-

7    residents."  (Pls.' Mov. Br. at 25:7-25.)  But the passage from *Clothesrigger* Plaintiffs

8    cite (incorrectly, as it actually appears on page 613, not 608), deals with whether

9    constitutional due process would prevent the application of California law, which is a

10   completely different issue than the third prong of the governmental interest test.

11   Indeed, although Plaintiffs have identified California interests (step two), they offer <u>no</u>

12   explanation of why California's interests would comparatively be more impaired than

13   those of other states if California's law was not applied.

14        Other states' interests would, in fact, be more impaired than California's by

15   applying California law.  *McCann* again provides guidance.  First, it is noteworthy

16   that the California Supreme Court, in deciding which state should be given the

17   "predominating lawmaking power," observed that the plaintiff's decision to invoke a

18   California court as forum "was not motivated by a desire to take advantage of the

19   opportunities afforded by California law and cannot reasonably be characterized as

20   forum shopping."  *McCann*, 48 Cal.4th at 98.  In stark contrast, this case cannot be

21   characterized as anything other than forum shopping.  Gianino initiated this case

22   under Illinois law in February 2009 in Illinois state court.  (Paris Decl., Ex. 14.)

23   When Alacer removed, he opted to dismiss and seek greener pastures in California.

24   This type of forum shopping has been condemned by the U.S. Supreme Court.  *Shutts*,

25

26   ---

27   [19]  For similar reasons, Plaintiffs cannot rely on *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th
     224 (2001).  *Wershba* involves the enforcement of a settlement of a nationwide class action in the
28   wake of an objection.  *Wershba* relied on the fact that "California's laws are among the strongest in
     the country," *id*. at 242, again giving credence to the erroneous theory that nationwide application is
     justified by the greater recovery for consumers that may sometimes be had under the UCL.

472 U.S. at 820 ("plaintiff's desire for forum law is rarely, if ever controlling.  In most cases the plaintiff shows his obvious wish for forum law by filing there.  'If a plaintiff could choose the substantive rules to be applied to an action … the invitation to forum shopping would be irresistible.'") (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 337 (1981) (dissent opinion of Powell, J.)).

Second, in regard to the third prong, *McCann* states that:

California choice-of-law cases continue to recognize that a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders, and in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future.

48 Cal. 4th at 97-98 (citations and quotations omitted).

Here, the more significant conduct with regard to the out-of-state putative class members took place in their respective states of residence:  Emergen-C was offered for sale in those states at retail, consumers in those states purchased the products, and those consumers were allegedly harmed when representations purportedly stated or implied on the packaging allegedly turned out not to be true.[20]  As in *McCann*, each state would be impaired if it was prevented from delineating the scope of recovery for its citizens and assuring businesses like Alacer that it would be subject to the "limitations on liability set forth in the jurisdiction's law." *Id*.

California's interests in regulating conduct outside California, on the other hand, will not significantly be impaired.  California will still be able to regulate Alacer as a domestic company, and to protect California citizens against allegedly misleading claims.  But that is not what this suit is about.  It is brought by non-Californians, seeking to impose California law throughout the country.  This violates the "presumption against the extraterritorial application of [California] statutes."

---

[20]  Approximately half of the Emergen-C products for sale during the proposed class period also were manufactured and labeled at facilities outside of California.  (Fugate Decl. ¶¶ 35-36.)

1  *Churchill Village, L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal.

2  2000).[21]

3      Nor can the Court apply California law simply "because it is presumably more

4  beneficial to" the putative class or "for efficiency's sake."  *Clark v. Experian Info.*

5  *Solutions, Inc.*, No. 1:03-cv-7882, 2005 WL 1027125, at *5 (N.D. Ill. Apr. 26, 2005).

6  On the contrary, this analysis usually favors the application of class members' home

7  states' laws in consumer protection cases.  *See, e.g., In re Charles Schwab Corp. Sec.*

8  *Litig.*, 264 F.R.D. 531, 537-38 (N.D. Cal. 2009) (refusing to apply California law to

9  non-California class members because "[s]tates have an interest in deciding the

10 contours of their own [laws]."); *Discover Bank v. Super. Ct.*, 134 Cal. App. 4th 886,

11 895 (2005) ("[Plaintiff] does not deny that California has no greater interest in

12 protecting other states' consumers than other states have in protecting California's.").

13     Moreover, Plaintiffs' suggestion that one state's laws should be found superior

14 to all others is a gross abrogation of fundamental principles of federalism.  *See Smith*

15 *v. Robbins*, 528 U.S. 259, 273 (2000) (noting Supreme Court's "established practice,

16 rooted in federalism, of allowing the States wide discretion, subject to the minimum

17 requirements of the Fourteenth Amendment, to experiment with solutions to difficult

18 problems of policy," even in constitutional matters).  The Supreme Court has

19 recognized that, as a "basic principle of federalism[,] each State may make its own

20 reasoned judgment about what conduct is permitted or proscribed within its borders."

21 *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  While every

22 state has enacted laws to protect its citizens, "states need not, and in fact do not,

23 provide such protection in a uniform manner."  *BMW v. Gore*, 517 U.S. 559, 568-73

24 (1996).

25     Plaintiffs' attempt to gloss over all other states' legislatively and judicially

26

27 _____

[21]  *Diamond Multimedia Systems, Inc. v. Super. Ct.*, 19 Cal. 4th 1036 (1999) is inapposite.  The case

28 turned on construction of wholly-different statutes than those at issue here (Cal. Corp. Code §§
25400, 25500) and the California legislature's interest in preventing stock market manipulation.  *See*
*id.* at 1045-1051.  None of the unique securities law interests or statutes is involved here.

pronounced policies governing business practices that occur in their jurisdiction in deference to California's alone would violate both the parties' and the states' substantive rights.  As the Third Circuit correctly observed, "the dictates of state law may not be buried under the vast expanse of a federal class action.  The parties' rights under state substantive law must be respected, and if that is not possible in a class action, then that procedure may not be used."  *In re School Asbestos Litig.*, 789 F.2d 996, 1007 (3d Cir. 1986); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) (rules of procedure like class certification shall not abridge, enlarge, or modify any substantive right).  Accordingly, certification must be denied because there can be no uniform law applied to the putative class.

## IV.   CONCLUSION

For the many foregoing reasons, Plaintiffs' motion for class certification should be denied with prejudice.

Dated:  December 23, 2011         **ALSTON & BIRD LLP**

By:   /s/  *Andrew E. Paris*
          Andrew E. Paris

333 South Hope Street, 16th Floor
Los Angeles, California 90071
Telephone:  (213) 576-1000
Facsimile:   (213) 576-1100
Email:  drew.paris@alston.com

JANE F. THORPE (*pro hac vice*)
SCOTT A. ELDER (*pro hac vice*)
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone:  (404) 881-7000
Facsimile:   (404) 881-7777
jane.thorpe@alston.com
scott.elder@alston.com

Attorneys for Defendant
**ALACER CORPORATION**

1

2
## CERTIFICATE OF SERVICE
3

4          I HEREBY CERTIFY that all counsel of record who are deemed to have consented to

5  electronic service are being served with a copy of this document via the Court's CM/ECF system

6  this 23rd day of December 2011.

7

8                                         _/s/  Andrew E. Paris_
                                       Andrew E. Paris
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28